BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com

*Attorneys for Plaintiff Dr. Mithilesh K. Jha*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DR. MITHILESH K. JHA, Derivatively on Behalf of SUPER MICRO COMPUTER, INC., <br><br> Plaintiff, <br><br> v. <br><br> CHARLES LIANG, SARA LIU, DANIEL W. FAIRFAX, TALLY LIU, SHERMAN TUAN, JUDY LIN, ROBERT BLAIR, WALLY LIAW, SHIU LEUNG (FRED) CHAN, and DAVID WEIGAND, <br><br> Defendants, <br><br> and, <br><br> SUPER MICRO COMPUTER, INC., <br><br> Nominal Defendant. | Case No. _____ <br><br> **VERIFIED SHARHOLDER DERIVATIVE COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Dr. Mithilesh K. Jha ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Super Micro Computer, Inc. ("Super Micro" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, the securities class actions *Menditto v. Super Micro Computer, Inc. et al.,* Case No. 3:24-cv-06149-SI (N.D. Cal.); *Spatz v. Super Micro Computer, Inc. et al.,* Case No. 5:24-cv-06193-EJD (N.D. Cal.); and *Averza v. Super Micro Computer, Inc. et al.,* Case No. 5:24-cv-06147-EJD (N.D. Cal.) (the "Securities Class Actions") and other matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy Defendants' violations of state and federal law that have occurred from February 2, 2021 through August 26, 2024 (the "Relevant Period") and have caused substantial harm to the Company.

2.      Super Micro, headquartered in San Jose, California, is a server and storage solutions manufacturer that sells its hardware to technology companies for use as servers for websites, data storage, cloud computing, and artificial intelligence applications.

3.      Throughout the Relevant Period, Defendants reported to investors and the market the Company's continued record demand, surging revenue growth, and increased product shipments. The Company also represented that it adhered to U.S. and other applicable trade control regulations and confirmed that no sales of any products actually occurred in the Russian Federation during fiscal years 2023 and 2024 and that the Company and its subsidiaries did not sell products or provide services to the Russian Federal Security Service ("FSB").

4.      As a result of these representations and the Company's reported financial and operational results, the price of the Company's common stock surged above $1,255 per share.

5.      On August 27, 2024, the truth began to emerge when investment research firm Hindenburg Research ("Hindenburg") issued a research report entitled *Super Micro: Fresh Evidence of Accounting Manipulation, Sibling Self-Dealing and Sanctions Evasion at this AI High Flyer* (the "Report"). In its Report, Hindenburg reported it had uncovered "glaring accounting red flags, evidence of undisclosed related party transactions, sanctions and export control failures, and customer issues."  As detailed in the Report and corroborated by a recent whistleblower lawsuit, these accounting manipulations included improper recognition of revenue, recognition of incomplete sales, channel stuffing, and the circumvention of internal accounting controls.

6.      The Report also stated that Hindenburg had uncovered evidence that the Company had evaded U.S. export controls and between February 24, 2022 and June 30, 2024; the Company's exports of products to Russia spiked, having shipped approximately $210 million of the Company products to Russia during that period thereby circumventing United States trade restrictions by shipping products "to Russia in larger-than-ever volumes since the invasion of Ukraine."

7.      As a result of these disclosures on August 27, 2024, the price of the Company common stock declined by $14.87 per share, falling 2.64% to close at $547.64.

8.      The next day, on August 28, 2024, the Company announced that it would not be timely filing its Form 10-K annual report as it is assessing the "design and operating effectiveness of its internal controls over financial reporting."

9.      As a result of these disclosures on August 28, 2024, the price of the Company common stock continued to decline, falling $104.15 per share, or 19.02%, to close at $443.49 – a cumulative two-day drop of 21.16%.

10.      In light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Actions, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the

1   Individual Defendants do not possess the requisite level of disinterestedness and independence to

2   consider a demand to commence litigation against themselves and the other Individual Defendants

3   on behalf of the Company. Accordingly, Plaintiff did not make a demand on the Board because,

4   as further detailed herein, demand would be a futile and useless act.

5                          **JURISDICTION AND VENUE**

6          11.    This Court also has jurisdiction over the subject matter of this action pursuant to 28

7   U.S.C. § 1331 as the claims asserted herein arise under Section 10(b) of the Securities Exchange

8   Act of 1934 (the "Exchange Act").

9          12.    This Court also has supplemental jurisdiction over Plaintiff's state law claims

10  pursuant to 28 U.S.C. § 1367(a).

11         13.    This Court has personal jurisdiction over each defendant named herein because

12  each defendant is either a corporation that conducts business in and maintains operations in this

13  District or is an individual who has sufficient minimum contacts with this District to render the

14  exercise of jurisdiction by the courts of this District permissible under traditional notions of fair

15  play and substantial justice.

16         14.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) the

17  Company maintains its principal place of business in this District; (ii) one or more of the

18  defendants either resides in or maintains executive offices in this District; (iii) a substantial portion

19  of the transactions and wrongs complained of herein, including Defendants' primary participation

20  in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary

21  duties owed to the Company, occurred in this District; and (iv) Defendants have received

22  substantial compensation in this District by doing business here and engaging in numerous

23  activities that had an effect in this District.

24         15.    In connection with the acts, transactions, and conduct alleged herein, the Individual

25  Defendants directly and indirectly used the means and instrumentalities of interstate commerce,

26  including the United States mail, interstate telephone communications, and the facilities of a

27  national securities exchange.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

**THE PARTIES**

2

**Plaintiff**

3

     16.     Plaintiff is, and was at relevant times, a shareholder of the Company.

4

**Nominal Defendant**

5

     17.     ***Nominal Defendant Super Micro*** is incorporated under the laws of Delaware with

6

its principal executive offices located at 980 Rock Avenue, San Jose, California, 95131. During

7

the Relevant Period, the Company's common stock traded on the NASDAQ Stock Market (the

8

"NASDAQ") under the symbol "SMCI."

9

**Director Defendants**

10

     18.     ***Defendant Charles Liang*** ("Liang") is the Company's Co-Founder, President,

11

Chief Executive Officer ("CEO"), and Chairman of the Board of Directors (the "Board"), having

12

held these positions since the Company's inception in 1993. According to the Company's public

13

filings, Defendant Liang received $18,098,671 during fiscal year 2021 in compensation from the

14

Company. Defendant Liang is married to Defendant Sara Liu. As of November 24, 2023,

15

Defendants Liang and Sara Liu jointly own 7,815,881 shares of the Company common stock,

16

worth $2,232,762,7251 and constituting 14.3% of the Company's total outstanding common stock.

17

Defendant Liang is named as a defendant in the Securities Class Actions (defined below).

18

     19.     ***Defendant Sara Liu*** ("S. Liu") is the Company's Co-Founder, Senior Vice

19

President, and has served on the Company's Board since the Company's inception in 1993. Since

20

co-founding the Company in 1993, Defendant Liu has held numerous roles within the Company.

21

Defendant S. Liu is married to Defendant Liang. As of November 24, 2023, Defendants S. Liu and

22

Liang jointly own 7,815,881 shares of the Company common stock, worth $2,232,762,725 and

23

constituting 14.3% of the Company's total outstanding common stock.

24

     20.     ***Defendant Daniel W. Fairfax*** ("Fairfax") has served as a Company director since

25

July 1, 2019. According to the Company's public filings, Defendant Fairfax received $317,800

26

during fiscal year 2023 in compensation from the Company. As of November 24, 2023, Defendant

27

Fairfax beneficially owns 20,987 shares of the Company common stock, worth $5,995,356.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

21.    ***Defendant Tally Liu*** ("T. Liu") has served as a Company director since January 30, 2019. According to the Company's public filings, Defendant T. Liu received $335,979 during fiscal year 2023 in compensation from the Company. As of November 24, 2023, Defendant T. Liu beneficially owns 28,313 shares of Company common stock, worth $8,088,174.

22.    ***Defendant Sherman Tuan*** ("Tuan") has served as a Company director since February 1, 2007. According to the Company's public filings, Defendant Tuan received $311,479 during fiscal year 2023 in compensation from the Company. As of November 24, 2023, Defendant Tuan beneficially owns 30,113 shares of Company common stock, worth $8,602,380.

23.    ***Defendant Judy Lin*** ("Lin") has served as a Company director since April 2022. According to the Company's public filings, Defendant Lin received $287,479 during fiscal year 2023 in compensation from the Company. As of November 24, 2023, Defendant Lin beneficially owns 4,863 shares of Company common stock, worth $1,389,213.

24.    ***Defendant Robert Blair*** ("Blair") has served as a Company director since December 2022. According to the Company's public filings, Defendant Blair received $149,015 during fiscal year 2023 in compensation from the Company. As of November 24, 2023, Defendant Blair beneficially owns 1,386 shares of Company common stock, worth $395,938.

25.    ***Defendant Wally Liaw*** ("Liaw") is the Company's Co-Founder and served as an employee and director through to January 2018. Then, in August 2022, Defendant Liaw returned to the Company as Senior Vice President, Business Development, and was re-appointed to the Board in December 2023. As of November 24, 2023, Defendant Liaw beneficially owns 1,592,998 shares of Company common stock, worth $455,071,738 and constituting 3% of the Company's total outstanding common stock.

26.    ***Defendant Shiu Leung (Fred) Chan*** ("Chan") served as a Company director from October 2020 through to March 11, 2024.

27.    The above-named defendants are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

28.    ***Defendant David E. Weigand*** ("Weigand") serves as the Company's Senior Vice President, Chief Financial Officer ("CFO"). According to the Company's public filings, Defendant Weigand received $633,537 during fiscal year 2021, $2,204,033 during fiscal year 2022, and $1,859,089 during fiscal year 2023 in compensation from the Company. As of November 24, 2023, Defendant Weigand beneficially owns 53,130 shares of Company common stock, worth $15,177,647. Defendant Weigand is named as a defendant in the Securities Class Actions (defined below).

29.    Defendant Weigand along with Defendant Liang are collectively referred to herein as the "Officer Defendants."

30.    The Officer Defendants along with the Director Defendants are collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background**

31.    Super Micro is an international company that develops, manufactures, and provides server and storage systems for various markets, including data centers, cloud computing, AI, 5G, and edge computing.

32.    The Company further offers server subsystems and accessories including complete servers, storage systems, modular blade servers, blades, workstations, full rack scale solutions, networking devices, and sub-systems, as well as management and security software.

## FALSE AND MISLEADING STATEMENTS

33.    On February 2, 2021, the Company issued a press release reporting its financial results for the quarter ended December 31, 2020, and filed a Form 8-K ("Q2 2021 Release"), followed by its Form 10-Q for the same period ("Q2 2021 Form 10-Q") filed on February 5, 2021. The Q2 2021 Form 10-Q was signed by Defendant Liang. These public statements and filings reported the Company's results and performance metrics for the quarter ended December 31, 2020.

34.    The Q2 2021 Release announced the following financial results, which were detailed in the Company's Form 10-Q:

- Net sales of $830 million versus $762 million in the first quarter of fiscal year 2021 and $871 million in the same quarter of last year.

- Gross margin of 16.4% versus 17.0% in the first quarter of fiscal year 2021 and 15.9% in the same quarter of last year.

- Net income of $28 million versus $27 million in the first quarter of fiscal year 2021 and $24 million in the same quarter of last year.

- Diluted net income per common share of $0.52 versus $0.49 in the first quarter of fiscal year 2021 and $0.46 in the same quarter of last year.

- Non-GAAP diluted net income per common share of $0.63 versus $0.55 in the first quarter of fiscal year 2021 and $0.57 in the same quarter of last year.

- Cash flow from operations of $63 million and capital expenditures of $14 million.

35.    The Q2 2021 Release also announced the resignation of the Company's CFO and announced that David Weigand, the then-Senior Vice President and Chief Compliance Officer, had been appointed as the Senior Vice President, Chief Financial Officer, and Corporate Secretary.

36.    On May 4, 2021, the Company issued a press release reporting its financial results for the quarter ended March 31, 2021, and filed a Form 8-K ("Q3 2021 Release"), followed by its Form 10-Q for the same period ("Q3 2021 Form 10-Q") filed on May 7, 2021. The Q3 2021 Form 10-Q was signed by Defendants Liang and Weigand. These public statements and filings reported the Company's results and performance metrics for the quarter ended March 31, 2021. The Q3 2021 Release announced the following financial results, which were detailed in the Company's Form 10-Q:

- Net sales of $896 million versus $830 million in the second quarter of fiscal year 2021 and $772 million in the same quarter of last year.

- Gross margin of 13.7% versus 16.4% in the second quarter of fiscal year 2021 and 17.3% in the same quarter of last year.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Net income of $18 million versus $28 million in the second quarter of fiscal year 2021 and $16 million in the same quarter of last year.

- Diluted net income per common share of $0.35 versus $0.52 in the second quarter of fiscal year 2021 and $0.29 in the same quarter of last year.

- Non-GAAP diluted net income per common share of $0.50 versus $0.63 in the second quarter of fiscal year 2021 and $0.84 in the same quarter of last year.

- Cash flow used in operations of $124 million and capital expenditures of $19 million.

37.     On August 10, 2021, the Company issued a press release reporting its financial results for the fourth quarter and full fiscal year 2021. In pertinent regard to the annual results, the Company provided the following summary:

Net sales for the fiscal year ended June 30, 2021, were $3.56 billion versus $3.34 billion for the fiscal year ended June 30, 2020. Net income for fiscal year 2021 was $112 million, or $2.09 per diluted share, versus $84 million, or $1.60 per diluted share, for fiscal year 2020. Non-GAAP net income for the fiscal year 2021 was $136 million, or $2.48 per diluted share, versus $150 million, or $2.77 per diluted share, for fiscal year 2020. Non-GAAP net income for the fiscal year 2021 adds back stock-based compensation expense of $28.5 million, special performance bonuses of $5.8 million, executive SEC settlement credit of $2.1 million, and controls remediation costs and other expenses of $1.3 million, less tax effects of $9.0 million.

38.     The Company further projected an outlook for fiscal year 2022, providing the following estimates:

The Company expects net sales of $4.1 billion to $4.5 billion, GAAP net income per diluted share of at least $2.60 and non-GAAP net income per diluted share of at least $3.00 for fiscal year 2022 ending June 30, 2022. The Company's projections for GAAP and non-GAAP net income per diluted share both assume a tax rate of approximately 16% and a fully diluted share count of 55.3 million shares for GAAP and fully diluted share count of 56.5 million shares for non-GAAP. The outlook for fiscal year 2022 GAAP net income per diluted share includes approximately $30 million in expected stock-based compensation expense and other expenses that are excluded from non-GAAP net income per diluted share.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

39.    In the Company's associated 10-K for fiscal year 2021, published on August 27, 2021 and signed by Defendants Liang, Weigand, S. Liu, Fairfax, Tseng, Tuan, Chan and T. Liu, the Company discussed its related party dealings as follows:

We use Ablecom, a related party, for contract design and manufacturing coordination support and warehousing, and Compuware, also a related party and an affiliate of Ablecom, for distribution, contract manufacturing and warehousing. We work with Ablecom to optimize modular designs for our chassis and certain of other components. We outsource to Compuware a portion of our design activities and a significant part of our manufacturing of subassemblies, particularly power supplies. Our purchases of products from Ablecom and Compuware represented 7.8%, 10.1% and 9.2% of our cost of sales for fiscal years 2021, 2020 and 2019, respectively. Ablecom and Compuware's sales to us constitute a substantial majority of Ablecom and Compuware's net sales. Ablecom and Compuware are both privately-held Taiwan-based companies. In addition, we have entered into a distribution agreement with Compuware, under which we have appointed Compuware as a nonexclusive distributor of our products in Taiwan, China and Australia.

Steve Liang, Ablecom's Chief Executive Officer and largest shareholder, is the brother of Charles Liang, our President, Chief Executive Officer and Chairman of our Board of Directors ("the Board"). Steve Liang owned no shares of our common stock as of June 30, 2021, 2020 or 2019. Charles Liang and his spouse, Sara Liu, our Co-Founder, Senior Vice President and Director, jointly owned approximately 10.5% of Ablecom's capital stock, while Mr. Steve Liang and other family members owned approximately 28.8% of Ablecom's outstanding common stock as of June 30, 2021. Bill Liang, a brother of both Charles Liang and Steve Liang, is a member of the Board of Directors of Ablecom as well.

In October 2018, our Chief Executive Officer, Charles Liang, personally borrowed approximately $12.9 million from Chien-Tsun Chang, the spouse of Steve Liang. The loan is unsecured, has no maturity date and bore interest at 0.8% per month for the first six months, increased to 0.85% per month through February 28, 2020, and reduced to 0.25% effective March 1, 2020. The loan was originally made at Mr. Liang's request to provide funds to repay margin loans to two financial institutions, which loans had been secured by shares of our common stock that he held. The lenders called the loans in October 2018, following the suspension of our common stock from trading on NASDAQ in August 2018 and the decline in the market price of our common stock in October 2018. As of June 30, 2021, the amount due on the unsecured loan (including principal and accrued interest) was approximately $15.3 million.

Bill Liang is also the Chief Executive Officer of Compuware, a member of Compuware's Board of Directors and a holder of a significant equity interest in

Compuware. Steve Liang is also a member of Compuware's Board of Directors and is an equity holder of Compuware.

\*\*\*

The Company has entered into a series of agreements with Ablecom, including multiple product development, production and service agreements, product manufacturing agreements, manufacturing services agreements and lease agreements for warehouse space.

Under these agreements, the Company outsources to Ablecom a portion of its design activities and a significant part of its server chassis manufacturing as well as an immaterial portion of other components. ***Ablecom manufactured approximately 91.8%, 95.5% and 96.3% of the chassis included in the products sold by the Company during fiscal years 2021, 2020 and 2019, respectively***. With respect to design activities, Ablecom generally agrees to design certain agreed-upon products according to the Company's specifications, and further agrees to build the tools needed to manufacture the products. The Company pays Ablecom for the design and engineering services, and further agrees to pay Ablecom for the tooling. The Company retains full ownership of any intellectual property resulting from the design of these products and tooling.

With respect to the manufacturing aspects of the relationship, Ablecom purchases most of materials needed to manufacture the chassis from third parties and ***the Company provides certain components used in the manufacturing process (such as power supplies) to Ablecom through consignment or sales transactions. Ablecom uses these materials and components to manufacture the completed chassis and then sell them back to the Company***. For the components purchased from the Company, Ablecom sells the components back to the Company at a price equal to the price at which the Company sold the components to Ablecom. The Company and Ablecom frequently review and negotiate the prices of the chassis the Company purchases from Ablecom. In addition to inventory purchases, the Company also incurs other costs associated with design services, tooling and other miscellaneous costs from Ablecom.

\*\*\*

The Company has entered into a distribution agreement with Compuware, under which the Company appointed Compuware as a non-exclusive distributor of the Company's products in Taiwan, China and Australia. Compuware assumes the responsibility to install the Company's products at the site of the end customer, if required, and administers customer support in exchange for a discount from the Company's standard price for its purchases.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

The Company also has entered into a series of agreements with Compuware, including a multiple product development, production and service agreements, product manufacturing agreements, and lease agreements for office space.

Under these agreements, the Company outsources to Compuware a portion of its design activities and a significant part of its power supplies manufacturing as well as an immaterial portion of other components. With respect to design activities, Compuware generally agrees to design certain agreed-upon products according to the Company's specifications, and further agrees to build the tools needed to manufacture the products. The Company pays Compuware for the design and engineering services, and further agrees to pay Compuware for the tooling. The Company retains full ownership of any intellectual property resulting from the design of these products and tooling. With respect to the manufacturing aspects of the relationship, Compuware purchases most of materials needed to manufacture the power supplies from outside markets and uses these materials to manufacture the products and then sell those products to the Company. The Company and Compuware frequently review and negotiate the prices of the power supplies the Company purchases from Compuware.

Compuware also manufactures motherboards, backplanes and other components used on printed circuit boards for the Company. ***The Company sells to Compuware most of the components needed to manufacture the above products. Compuware uses the components to manufacture the products and then sells the products back to the Company at a purchase price equal to the price at which the Company sold the components to Compuware, plus a "manufacturing value added" fee and other miscellaneous material charges and costs***. The Company and Compuware frequently review and negotiate the amount of the "manufacturing value added" fee that will be included in the price of the products the Company purchases from Compuware. In addition to the inventory purchases, the Company also incurs costs associated with design services, tooling assets, and miscellaneous costs.

\*\*\*

The Company's net sales to Ablecom were not material for the fiscal years ended June 30, 2021, 2020 and 2019.

\*\*\*

***Ablecom's sales to us comprise a substantial majority of Ablecom's net sales. For fiscal years ended June 30, 2021, 2020 and 2019, we purchased products from Ablecom totaling $122.2 million, $152.5 million and $137.9 million, respectively***. Amounts owed to Ablecom by us as of June 30, 2021 and 2020, were $41.2 million and $40.1 million, respectively. For the fiscal years ended June 30, 2021, 2020 and 2019, we paid Ablecom $8.6 million, $7.6 million and $7.4 million, respectively, for design services, tooling assets and miscellaneous costs.

***Compuware's sales of our products to others comprise a majority of Compuware's net sales. For fiscal years ended June 30, 2021, 2020 and 2019, we***

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*sold products to Compuware totaling $27.9 million, $23.9 million and $17.7 million, respectively*. Amounts owed to us by Compuware as of June 30, 2021 and 2020, were $18.4 million and $14.3 million, respectively. The price at which Compuware purchases the products from us is at a discount from our standard price for purchasers who purchase specified volumes from us. In exchange for this discount, Compuware assumes the responsibility to install our products at the site of the end customer and administers first-level customer support. *For the fiscal years ended June 30, 2021, 2020 and 2019, we purchased products from Compuware totaling $113.4 million, $130.6 million and $138.9 million, respectively*. Amounts we owe to Compuware as of June 30, 2021 and 2020, were $46.4 million and $46.5 million, respectively. For the fiscal years ended June 30, 2021, 2020 and 2019, we paid Compuware $1.8 million, $1.2 million and $0.7 million, respectively, for design services, tooling assets and miscellaneous costs.[1]

40.     On November 2, 2021, the Company issued a press release reporting its financial results for the quarter ended September 30, 2021, and filed a Form 8-K ("Q1 2022 Release"), followed by its Form 10-Q for the same period ("Q1 2022 Form 10-Q") filed on November 5, 2021. The Q1 2022 Form 10-Q was signed by Defendants Liang and Weigand. These public statements and filings reported the Company's results and performance metrics for the quarter ended September 30, 2021. The Q1 2022 Release announced the following financial results, which were detailed in the Company's Form 10-Q:

- •     Net sales of $1.03 billion versus $1.07 billion in the fourth quarter of fiscal year 2021 and $762 million in the same quarter of last year.

- •     Gross margin of 13.4% versus 13.6% in the fourth quarter of fiscal year 2021 and 17.0% in the same quarter of last year.

- •     Net income of $25 million versus $39 million in the fourth quarter of fiscal year 2021 and $27 million in the same quarter of last year.

- •     Diluted net income per common share of $0.48 versus $0.74 in the fourth quarter of fiscal year 2021 and $0.49 in the same quarter of last year.

- •     Non-GAAP diluted net income per common share of $0.58 versus $0.81 in the fourth quarter of fiscal year 2021 and $0.55 in the same quarter of last year.

---

[1]     Unless indicated otherwise, all emphasis is added.

- Cash flow used in operations of $135 million and capital expenditures of $12 million.

41.    On February 1, 2022, the Company issued a press release reporting its financial results for the quarter ended December 31, 2021, and filed a Form 8-K ("Q2 2022 Release"), followed by its Form 10-Q for the same period ("Q2 2022 Form 10-Q") filed on February 4, 2022. The Q2 2022 Form 10-Q was signed by Defendants Liang and Weigand. These public statements and filings reported the Company's results and performance metrics for the quarter ended December 31, 2021. The Q2 2022 Release announced the following financial results, which were detailed in the Company's Form 10-Q:

- Net sales of $1.17 billion versus $1.03 billion in the first quarter of fiscal year 2022 and $830 million in the same quarter of last year.

- Gross margin of 14.0% versus 13.4% in the first quarter of fiscal year 2022 and 16.4% in the same quarter of last year.

- Net income of $42 million versus $25 million in the first quarter of fiscal year 2022 and $28 million in the same quarter of last year.

- Diluted net income per common share of $0.78 versus $0.48 in the first quarter of fiscal year 2022 and $0.52 in the same quarter of last year.

- Non-GAAP diluted net income per common share of $0.88 versus $0.58 in the first quarter of fiscal year 2022 and $0.63 in the same quarter of last year

- Cash flow used in operations for the second quarter of fiscal year 2022 of $53 million and capital expenditures of $12 million.

42.    On May 3, 2022, the Company issued a press release reporting its financial results for the quarter ended March 31, 2022, and filed a Form 8-K ("Q3 2022 Release"), followed by its Form 10-Q for the same period ("Q3 2022 Form 10-Q") filed on May 6, 2022. The Q3 2022 Form 10-Q was signed by Defendants Liang and Weigand. These public statements and filings reported the Company's results and performance metrics for the quarter ended March 31, 2022. The Q3 2022 Release announced the following financial results, which were detailed in the Company's Form 10-Q:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Net sales of $1.36 billion versus $1.17 billion in the second quarter of fiscal year 2022 and $896 million in the same quarter of last year.

- Gross margin of 15.5% versus 14.0% in the second quarter of fiscal year 2022 and 13.7% in the same quarter of last year.

- Net income of $77 million versus $42 million in the second quarter of fiscal year 2022 and $18 million in the same quarter of last year.

- Diluted net income per common share of $1.43 versus $0.78 in the second quarter of fiscal year 2022 and $0.35 in the same quarter of last year.

- Non-GAAP diluted net income per common share of $1.55 versus $0.88 in the second quarter of fiscal year 2022 and $0.50 in the same quarter of last year.

- Cash flow used in operations for the third quarter of fiscal year 2022 of $228 million and capital expenditures of $11 million.

43.    In the Q3 2022 Form 10-Q, the Company also stated:

The crisis in eastern Europe continues to be a challenge to global companies, including us, which have customers in the impacted regions. The U.S. and other global governments have placed restrictions on how companies may transact with businesses in these regions, particularly Russia, Belarus and restricted areas in Ukraine. ***Because of these restrictions and the growing logistical and other challenges, we have paused sales to Russia, Belarus and the restricted areas in Ukraine.*** This decision, which is in line with the approach of other global technology companies, helps us comply with our obligations under the various requirements in the U.S. and around the world.

\*\*\*

we do not make a material portion of our sales or acquire a material portion of our parts or components directly from impacted regions

\*\*\*

no assurances can be given that additional developments in the impacted regions, and responses thereto from the U.S. and other global governments, would not have a material adverse effect on our business, results of operations and financial condition.

44.    The Company reiterated the exact or materially similar statements as set forth *supra* in its Forms 10-K filed with the SEC on August 29, 2022 and August 25, 2023.

45.   On August 9, 2022, the Company issued a press release reporting its financial results for the fourth quarter and full fiscal year 2022. Defendant Liang praised the Company's performance, stating:

> The Supermicro team has attained yet another milestone by achieving $5.2 billion in annual revenue . . . The ramp up of recent design wins and top tier customers adopting our plug and play ("PNP") rack-scale solutions have given us momentum going into fiscal year 2023. We are well on our way to becoming the leading global supplier of rack-scale Total IT Solutions, powering the world's digital transformation across diverse applications in key market segments including AI, enterprise, cloud, edge/telco and others.

46.   The Company also provided the following summary:

> Net sales for the fiscal year ended June 30, 2022, were $5.20 billion versus $3.56 billion for the fiscal year ended June 30, 2021. Net income for fiscal year 2022 was $285 million, or $5.32 per diluted share, versus $112 million, or $2.09 per diluted share, for fiscal year 2021. Non-GAAP net income for the fiscal year 2022 was $311 million, or $5.65 per diluted share, versus $136 million, or $2.48 per diluted share, for fiscal year 2021. Non-GAAP net income for the fiscal year 2022 adds back stock-based compensation expense of $32.8 million, litigation expenses of $4.4 million, $2.0 million of litigation settlement costs, and $0.5 million of special performance bonuses, net of the related tax effects.

47.   Ther Company further projected an outlook for fiscal year 2023, providing the following estimates:

> For fiscal year 2023 ending June 30, 2023, the Company expects net sales of $6.2 billion to $7.0 billion, GAAP net income per diluted share of at least $7.27 and non-GAAP net income per diluted share of at least $7.50. The Company's projections for GAAP and non-GAAP net income per diluted share assume a tax rate of approximately 20.3% and 21.1%, respectively, and a fully diluted share count of 55.6 million shares for GAAP and fully diluted share count of 57.0 million shares for non-GAAP. The outlook for fiscal year 2023 GAAP net income per diluted share includes approximately $35.4 million in expected stock-based compensation expense and other expenses, net of related tax effects that are excluded from non-GAAP net income per diluted share.

48.   In the Company's associated Form 10-K for fiscal year 2022, published on August 29, 2022 and signed by Defendants Liang, Weigand, S. Liu, Fairfax, Lin, Tuan, Chan, and T. Liu, the Company provided updated financial details concerning the Company's related party dealings as follows:

Ablecom manufactured approximately 88.2%, 91.8% and 95.5% of the chassis included in the products sold by the Company during fiscal years 2022, 2021 and 2020, respectively.

\*\*\*

Ablecom's sales to us comprise a substantial majority of Ablecom's net sales. ***For fiscal years ended June 30, 2022, 2021 and 2020, we purchased products from Ablecom totaling $192.4 million, $122.2 million and $152.5 million, respectively***. Amounts owed to Ablecom by us as of June 30, 2022, 2021 and 2020, were $46.0 million, $41.2 million and $40.1 million, respectively. For the fiscal years ended June 30, 2022, 2021 and 2020, we paid Ablecom $8.3 million, $8.6 million and $7.6 million, respectively, for design services, tooling assets and miscellaneous costs.

Compuware's sales of our products to others comprise a majority of Compuware's net sales. ***For fiscal years ended June 30, 2022, 2021 and 2020, we sold products to Compuware totaling $26.1 million, $27.9 million and $23.9 million, respectively***. Amounts owed to us by Compuware as of June 30, 2022, 2021 and 2020, were $20.0 million, $18.4 million and $14.3 million, respectively. The price at which Compuware purchases the products from us is at a discount from our standard price for purchasers who purchase specified volumes from us. In exchange for this discount, Compuware assumes the responsibility to install our products at the site of the end customer and administers first-level customer support. ***For the fiscal years ended June 30, 2022, 2021 and 2020, we purchased products from Compuware totaling $170.3 million, $113.4 million and $130.6 million, respectively***. Amounts we owed to Compuware as of June 30, 2022, 2021 and 2020 were $60.0 million, $46.4 million and $46.5 million, respectively. For the fiscal years ended June 30, 2022, 2021 and 2020, we paid Compuware $1.5 million, $1.8 million and $1.2 million, respectively, for design services, tooling assets and miscellaneous costs.

49.     On November 1, 2022, the Company issued a press release reporting its financial results for the quarter ended September 30, 2022, and filed a Form 8-K ("Q1 2023 Release"), followed by its Form 10-Q for the same period ("Q1 2023 Form 10-Q") filed on November 4, 2022, which was signed by Defendants Liang and Weigand. These public statements and filings reported the Company's results and performance metrics for the quarter ended September 30, 2022. The Q1 2023 Release announced the following financial results, which were detailed in the Company's Form 10-Q:

- • Net sales of $1.85 billion versus $1.64 billion in the fourth quarter of fiscal year 2022 and $1.03 billion in the same quarter of last year.

- • Gross margin of 18.8% versus 17.6% in the fourth quarter of fiscal year 2022 and 13.4% in the same quarter of last year.

- • Net income of $184 million versus $141 million in the fourth quarter of fiscal year 2022 and $25 million in the same quarter of last year.

- • Diluted net income per common share of $3.35 versus $2.60 in the fourth quarter of fiscal year 2022 and $0.48 in the same quarter of last year.

- • Non-GAAP diluted net income per common share of $3.42 versus $2.62 in the fourth quarter of fiscal year 2022 and $0.58 in the same quarter of last year.

- • Cash flow provided by operations for the first quarter of fiscal year 2023 of $314 million and capital expenditures of $11 million.

50.    On January 31, 2023, the Company issued a press release reporting its financial results for the quarter ended December 31, 2022, and filed a Form 8-K ("Q2 2023 Release"), followed by its Form 10-Q for the same period ("Q2 2023 Form 10-Q") filed on February 3, 2023. The Q2 2023 Form 10-Q was signed by Defendants Liang and Weigand. These public statements and filings reported the Company's results and performance metrics for the quarter ended December 31, 2023. The Q2 2023 Release announced the following financial results, which were detailed in the Company's Form 10-Q:

- • Net sales of $1.80 billion versus $1.85 billion in the first quarter of fiscal year 2023 and $1.17 billion in the same quarter of last year.

- • Gross margin of 18.7% versus 18.8% in the first quarter of fiscal year 2023 and 14.0% in the same quarter of last year.

- • Net income of $176 million versus $184 million in the first quarter of fiscal year 2023 and $42 million in the same quarter of last year.

- • Diluted net income per common share of $3.14 versus $3.35 in the first quarter of fiscal year 2023 and $0.78 in the same quarter of last year.

- • Non-GAAP diluted net income per common share of $3.26 versus $3.42 in the first quarter of fiscal year 2023 and $0.88 in the same quarter of last year.

- Cash flow provided by operations for the second quarter of fiscal year 2023 of $161 million and capital expenditures of $10 million.

51.    On May 2, 2023, the Company issued a press release reporting its financial results for the quarter ended March 31, 2023, and filed a Form 8-K ("Q3 2023 Release"), followed by its Form 10-Q for the same period ("Q3 2023 Form 10-Q") filed on May 5, 2023. The Q3 2023 Form 10-Q was signed by Defendants Liang and Weigand. These public statements and filings reported the Company's results and performance metrics for the quarter ended March 31, 2023. The Q3 2023 Release announced the following financial results, which were detailed in the Company's Form 10-Q:

- Net sales of $1.28 billion versus $1.80 billion in the second quarter of fiscal year 2023 and $1.36 billion in the same quarter of last year.

- Gross margin of 17.6% versus 18.7% in the second quarter of fiscal year 2023 and 15.5% in the same quarter of last year.

- Net income of $86 million versus $176 million in the second quarter of fiscal year 2023 and $77 million in the same quarter of last year.

- Diluted net income per common share of $1.53 versus $3.14 in the second quarter of fiscal year 2023 and $1.43 in the same quarter of last year.

- Non-GAAP diluted net income per common share of $1.63 versus $3.26 in the second quarter of fiscal year 2023 and $1.55 in the same quarter of last year.

- Cash flow provided by operations for the third quarter of fiscal year 2023 of $198 million and capital expenditures of $8 million.

52.    In addition, the Q3 2023 Form 10-Q confirmed:

The Company had previously, before the designation of the FSB in Executive Order 13382, authorized certain third parties to periodically file notifications with, or apply for import licenses and permits from, the FSB on our behalf in connection with the importation of our products into Russia, as permitted under OFAC authorizations. During fiscal year 2023, including the most recent quarter ended March 31, 2023, third parties filed notifications with, applied for import licenses and permits from, and/or received the associated approvals from the FSB on our behalf. However, no sales of any products actually occurred in the Russian Federation during fiscal year 2023, including the most recent quarter ended March 31, 2023, and accordingly, these filing activities did not result in any revenue or

otherwise contribute to the Company's net income for these quarters. The Company is in the process of terminating these authorizations. The Company and its subsidiaries do not sell products or provide services to the FSB. The Company and its subsidiaries had last recorded revenue from Russia on February 23, 2022.

53.    The Company reiterated the exact or materially similar statements, as set forth *supra*, in its Form 10-K filed with the SEC on August 25, 2023.

54.    On August 8, 2023, the Company issued a press release reporting its financial results for the fourth quarter and full fiscal year 2023. The Company provided the following summary:

Net sales for the fiscal year ended June 30, 2023, were $7.12 billion versus $5.20 billion for the fiscal year ended June 30, 2022. Net income for fiscal year 2023 was $640 million, or $11.43 per diluted share, versus $285 million, or $5.32 per diluted share, for fiscal year 2022. Non-GAAP net income for fiscal year 2023 was $673 million, or $11.81 per diluted share, versus $311 million, or $5.65 per diluted share, for fiscal year 2022. Non-GAAP net income for fiscal year 2023 adds back stock-based compensation expense of $54 million and litigation recovery of $4 million, net of the related tax effects of $17 million.

55.    Speaking to these results, Defendant Liang provided the following commentary:

Supermicro's record revenue and 37% year-over-year growth for fiscal year 2023 validates our global leadership position in AI accelerated compute platforms . . . We continue to see unprecedented demand for AI and other advanced applications requiring optimized rack-scale solutions. We are in a great position to continue our growth momentum given our record new design wins, customers, and backlog for our best-in-class rack-scale Total AI & IT Solutions.

56.    The Company further projected an outlook for fiscal year 2024. The Company provided significantly less detail for its estimate that in prior years, providing only that "[f]or fiscal year 2024 ending June 30, 2024, the Company expects net sales of $9.5 billion to $10.5 billion."

57.    In the Company's associated 10-K for fiscal year 2023, published on August 28, 2023 and signed by Defendants Liang, Weigand, S. Liu, Fairfax, Lin, Blair, Tuan, Chan, and T. Liu, the Company provided updated financial details concerning its related party dealings as follows:

Ablecom manufactured approximately 91.9%, 88.2% and 91.8% of the chassis included in the products sold by the Company during fiscal years 2023, 2022 and 2021, respectively.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*\*\**

Ablecom's sales to us comprise a substantial majority of Ablecom's net sales. **_For fiscal years ended June 30, 2023, 2022 and 2021, we purchased products from Ablecom totaling $167.8 million_**, $192.4 million and $122.2 million, respectively. Amounts owed to Ablecom by us as of June 30, 2023, 2022 and 2021, were $36.9million, $46.0 million and $41.2 million, respectively. For the fiscal years ended June 30, 2023, 2022 and 2021, we paid Ablecom $12.1 million, $8.3 million and $8.6 million, respectively, for design services, tooling assets and miscellaneous costs.

Compuware's sales of our products to others comprise a majority of Compuware's net sales. For fiscal years ended June 30, 2023, 2022 and 2021, **_we sold products to Compuware totaling $36.3 million_**, $26.1 million and $27.9 million, respectively. Amounts owed to us by Compuware as of June 30, 2023, 2022 and 2021, were $24.9 million, $19.6 million and $18.2 million, respectively. The price at which Compuware purchases the products from us is at a discount from our standard price for purchasers who purchase specified volumes from us. In exchange for this discount, Compuware assumes the responsibility to install our products at the site of the end customer and administers first-level customer support. **_For the fiscal years ended June 30, 2023, 2022 and 2021, we purchased products from Compuware totaling $217.0 million_**, $170.3 million and $113.4 million, respectively. Amounts we owed to Compuware as of June 30, 2023, 2022 and 2021 were $66.2 million, $60.0 million and $46.4 million, respectively. For the fiscal years ended June 30, 2023, 2022 and 2021, we paid Compuware $2.0 million, $1.5 million and $1.8 million, respectively, for design services, tooling assets and miscellaneous costs.

58.    The Company, in the same report, highlighted that "no sales of any products actually occurred in the Russian Federation during fiscal year 2023," and reiterated further that the "Company and its subsidiaries had last recorded revenue from Russia on February 23, 2022."

59.    On November 1, 2023, the Company issued a press release announcing its financial results for the quarter ended September 30, 2023, and filed a Form 8-K ("Q1 2024 Release"), followed by its Form 10-Q for the same period ("Q1 2024 Form 10-Q") filed on November 3, 2023. The Q1 2024 Form 10-Q was signed by Defendants Liang and Weigand. These public statements and filings reported the Company's results and performance metrics for the quarter ended September 30, 2023. The Q1 2024 Release announced the following financial results, which were detailed in the Company's Form 10-Q:

- •    Net sales of $2.12 billion versus $2.18 billion in the fourth quarter of fiscal year 2023 and $1.85 billion in the same quarter of last year.

- Gross margin of 16.7% versus 17.0% in the fourth quarter of fiscal year 2023 and 18.8% in the same quarter of last year.

- Net income of $157 million versus $194 million in the fourth quarter of fiscal year 2023 and $184 million in the same quarter of last year.

- Diluted net income per common share of $2.75 versus $3.43 in the fourth quarter of fiscal year 2023 and $3.35 in the same quarter of last year.

- Non-GAAP diluted net income per common share of $3.43 versus $3.51 in the fourth quarter of fiscal year 2023 and $3.42 in the same quarter of last year.

- Cash flow provided by operations for the first quarter of fiscal year 2024 of $271 million and capital expenditures of $3 million.

60.     On December 8, 2023, the Company announced that Yih-Shyan (Wally) Liaw was re-joining the Board. The announcement detailed Liaw's history with the Company, his prior resignation and the circumstances surrounding it, and his return to the Company, as follows:

Mr. Liaw co-founded the Company in 1993. From the Company's founding until January 2018, Mr. Liaw was an employee and held various executive positions in the Company, including Senior Vice President of Worldwide Sales and Corporate Secretary. He was also a member of the Board of Directors from 1993 until January 2018. *In January 2018, Mr. Liaw resigned from all his positions with the Company, including from the Board of Directors, during a period when the Company was not current in its filings with the Securities and Exchange Commission, and, following completion of an Audit Committee investigation, in connection with a restructuring of the Company's sales organization as part of the Company's remediation of material weaknesses in its internal control over financial reporting*. From February 2018 until June 2020, Mr. Liaw was retired. From June 2020 until April 2021, Mr. Liaw was the president of 2CRSi Corporation, a company headquartered in Strasbourg, France that develops, produces and sells high-performance customized, environmentally-friendly servers. *Mr. Liaw returned to the Company as a consultant in May 2021*, advising the Company with respect to business development matters. *In August 2022, Mr. Liaw returned to full-time employment with the Company as Senior Vice President, Business Development*.

61.     On January 29, 2024, the Company issued a press release reporting its financial results for the quarter ended December 31, 2023, and filed a Form 8-K ("Q2 2024 Release"), followed by its Form 10-Q for the same period ("Q2 2024 Form 10-Q") filed on February 2, 2024.

The Q2 2024 Form 10-Q was signed by Defendants Liang and Weigand. These public statements and filings reported the Company's results and performance metrics for the quarter ended December 31, 2023. The Q1 2024 Release announced the following financial results, which were detailed in the Company's Form 10-Q:

- Net sales of $3.66 billion versus $2.12 billion in the first quarter of fiscal year 2024 and $1.80 billion in the same quarter of last year.

- Gross margin of 15.4% versus 16.7% in the first quarter of fiscal year 2024 and 18.7% in the same quarter of last year.

- Net income of $296 million versus $157 million in the first quarter of fiscal year 2024 and $176 million in the same quarter of last year.

- Diluted net income per common share of $5.10 versus $2.75 in the first quarter of fiscal year 2024 and $3.14 in the same quarter of last year.

- Non-GAAP diluted net income per common share of $5.59 versus $3.43 in the first quarter of fiscal year 2024 and $3.26 in the same quarter of last year.

- Cash flow used in operations for the second quarter of fiscal year 2024 of $595 million and capital expenditures of $15 million.

62.    On April 30, 2024, the Company issued a press release reporting its financial results for the quarter ended March 31, 2024, and filed a Form 8-K ("Q3 2024 Release"), followed by its Form 10-Q for the same period ("Q3 2024 Form 10-Q") filed on May 6, 2024. The Q3 2024 Form 10-Q was signed by Defendants Liang and Weigand. These public statements and filings reported the Company's results and performance metrics for the quarter ended March 31, 2024. The Q3 2024 Release announced the following financial results, which were detailed in the Company's Form 10-Q:

- Net sales of $3.85 billion versus $3.66 billion in the second quarter of fiscal year 2024 and $1.28 billion in the same quarter of last year.

- Gross margin of 15.5% versus 15.4% in the second quarter of fiscal year 2024 and 17.6% in the same quarter of last year.

1
2
- • Net income of $402 million versus $296 million in the second
quarter of fiscal year 2024 and $86 million in the same quarter of
last year.

3
4
- • Diluted net income per common share of $6.56 versus $5.10 in the
second quarter of fiscal year 2024 and $1.53 in the same quarter of
last year.

5
6
7
- • Non-GAAP diluted net income per common share of $6.65 versus
$5.59 in the second quarter of fiscal year 2024 and $1.63 in the same
quarter of last year.

8
9
- • Cash flow used in operations for the third quarter of fiscal year 2024
of $1,520 million and capital expenditures of $93 million.

10
11
12
63.    On August 6, 2024, the Company issued a press release reporting its financial results for the fourth quarter and full fiscal year 2024. The Company provided the following summary:

13
14
15
16
17
Net sales for the fiscal year ended June 30, 2024, were $14.94 billion versus $7.12 billion for the fiscal year ended June 30, 2023. Net income for fiscal year 2024 was $1.21 billion, or $20.09 per diluted share, versus $640 million, or $11.43 per diluted share, for fiscal year 2023. Non-GAAP net income for fiscal year 2024 was $1.34 billion, or $22.09 per diluted share, versus $673 million, or $11.81 per diluted share, for fiscal year 2023. Non-GAAP net income for fiscal year 2024 adds back stock-based compensation expense of $135 million, net of the related tax effects of $93 million.

18
19
20
21
64.    Defendant Liang again provided some commentary on the results, claiming that "Supermicro continues to experience record demand of new AI infrastructures propelling fiscal 2024 revenue up 110% year over year to $14.9 billion and non-GAAP earnings per share up 87% to $22.09." He further addressed the Company's future, stating:

22
23
24
We are well positioned to become the largest IT infrastructure company, driven by our technology leadership including rack-scale DLC liquid cooling and business values of our new Datacenter Building Block Solutions. The investments in Malaysia and Silicon Valley expansions will further strengthen our supply chain, security, and economies of scale necessary for the growing AI revolution.

25
26
27
65.    The above-referenced statements were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth while also minimizing risk from

28

seasonality and macroeconomic fluctuations. In truth, the Company's optimistic reports of significant growth, earnings potential, a healthy relationship with its related parties, and an assertion of ceasing shipment to wartime zones in compliance with government restrictions fell short of reality as they: (i) failed to incorporate the true circumstances of the Company's accounting and improper revenue recognition; (ii) entered into related party transactions with entities controlled by Defendant Liang's siblings; and (iii) failed to disclose and the true state of the Company's business dealings in and to Russia in violation of U.S. export control laws.

## **THE TRUTH EMERGES**

66.    On August 27, 2024, Hindenburg Research ("Hindenburg") unveiled a research report entitled *Super Micro: Fresh Evidence of Accounting Manipulation, Sibling Self-Dealing and Sanctions Evasion at this AI High Flyer* (the "Report"). According to the Report, Hindenburg's "3-month investigation" uncovered "glaring accounting red flags, evidence of undisclosed related party transactions, sanctions and expert control failures, and customer issues."

> All told, we believe Super Micro is a serial recidivist. It benefitted as an early mover but still faces significant accounting, governance and compliance issues and offers an inferior product and service now being eroded away by more credible competition.

67.    The Report disclosed additional details surrounding the circumstances of the prior employment and subsequent retention of several key executives who departed the Company in a prior "accounting scandal" for which the Company was fined $17.5 million by the SEC. In pertinent part, the Report discussed Wally Liaw, Phidias Chou, Salim Fedel, and Howard Hideshima, as follows:

> When we spoke to former Super Micro executives, they told us Wally Liaw presided over the sales teams that were involved in the previous accounting violations: "If you go back to Wally's team, every one of those [people] has their hand in that mess. You can promise yourself that"

> One former executive told us they had questioned the decision to rehire Wally, asking at the time: "Why are we having this conversation about Wally coming back as a contractor? So when I saw him come back I had the same thought, like, wow, that's, uh, that's interesting."

Normally, leaving amid an accounting scandal would be the end of an executive's association with a form. Yet a recent media report in April 2024 by Asia University, Taiwan, reported that Phidias Chou attended a Super Micro meeting with CEO Charles Liang, where Chou was vaguely identified as "deputy CEO." . . . In another article, describing the same meeting, he was simply referred to as a "consultant."

\*\*\*

A former executive told us [that Salim Fedel was also associated with unlawful activities]: "He was involved with the restatement. He was one of the sloppy salespeople. He got fired because he was so aggressive." . . . Super Micro rehired him as Vice President of Business Development and Strategic Sales in October 2020, per his LinkedIn.

\*\*\*

[Howard] Hideshima was rehired as a consultant in May 2023 to a related party entity of Super Micro called Ablecom Technology, according to his LinkedIn profile. Ablecom is led by Super Micro CEO Charles Liang's brother. Super Micro's CEO and his wife own 10.5%. The entity has hundreds of millions of dollars in transactions with Super Micro per year, per its 10-k.

\*\*\*

Former employees explained how these rehires were borne out of long-standing relationships with CEO Charles Liang, who valued loyalty over all else. Per one former sales director: "I wouldn't take comfort in that. If people were let go because their practices were questionable, to bring them back would give me less comfort. I don't think the behavior of the company in many ways has changed in the 5 years since I started, and I started shortly after the delisting problem. Another sales director attributed it to nepotism: "They were hired back. And there was a lot of nepotism. I'm speaking freely."

68.    According to the Report, it was not just the employees returning that risked the Company's accounting standards, but rather the Company had never changed mindset. The Report stated:

"Our interviews with former employees corroborate that Super Micro continued recognizing incomplete sales as revenue after the SEC Settlement in 2020.

Pressure to meet quotas pushed salespeople to stuff the channel with distributors, using "partial shipments," per former sales director.

\*\*\*

[Former employees] told us salespeople worked with distributors of Super Micro, including Avnet and Tech Data to over-ship product to boost numbers, in what

appeared to be a channel stuffing scheme. This resulted from sales teams being put under "massive pressure" from Charles Liang each quarter.

\*\*\*

Our interviews also corroborate further revenue recognition issues related to shipping highly defective products around quarter-end.

69.    The Report additionally discussed significant potential issues with the Company's related party dealings, both disclosed and undisclosed. Beginning with the former, the Report discussed the Company's relationship with Ablecom and Compuware, stating:

Ablecom was founded in 1997, per its website. Its CEO and largest shareholder is Steve (Jianfa) Liang, a younger brother of Super Micro's CEO Charles Liang, per the company's 2023 annual report. Steve Liang owns 28.8% of Ablecom shares along with unnamed "other family members." Super Micro CEO Charles Liang, and his wife, who is also a director at Super Micro, own 10.5% of Ablecom shares. An unnamed sibling of co-founder Wally Liaw owns 11.7%, per filings.

Compuware was founded in 2004, per its website. Its CEO is Bill (Jianda) Liang, also a younger brother of Super Micro's CEO, per the company's 2023 10-K. Brother Steve Liang [of Ablecom] is also a director and shareholder of Compuware.

As of April 2024, Bill Liang and his immediate family owned 15.83% of Compuware while elder brother Steve Liang and his wife and immediate family owned a much larger 37.67% stake, per shareholdings disclosed in filings by one of its investees. Ablecom owned a 15% stake in Compuware.

Both Ablecom and Compuware are collocated with Super Micro's facility in Taiwan.

\*\*\*

[B]oth Ablecom and Compuware's global export sales appear highly concentrated on Super Micro and the U.S., based on available import-expert records via Tradesparq, which may not cover all import markets.

Our analysis of those records shows that of Ablecom's exports to the U.S., ~99.8% were to Super Micro between January 1st, 2020 and June 30th, 2024 (the end of Super Micro's fiscal year).

Reflecting a similar pattern, in the same period, 99.7% of Compuware's exports to the U.S. were to Super Micro, based on available Tradesparq data.
In short, these related party suppliers have almost no business in the U.S. – and apparently very little elsewhere in the world – apart from Super Micro, suggesting they were set up as extensions of the public company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

A former engineer at Ablecom confirmed the conclusions we drew from the trade data. They told us via written message: "Ablecom is a very special supplier of chassis and thermal module to SMC [Super Micro] … Ablecom has about 90% revenue comes from SMC [Super Micro]." The engineer also indicated that Super Micro CEO Charles Liang was the person calling the shots at Ablecom and Compuware: "SMC [Super Micro], Ablecom and Compuware have a regular operation meeting hosted by Charles Liang." They said the operation meeting was held monthly and went on to explain that "Steve [Liang] and Bill [Liang] are in charge of chassis and PSU [power supply unit], respectively."

70.    Furthermore, according to the report, despite the Company's claims of a "competitive edge" in liquid cooled solutions, the Company purportedly presented Ablecom's liquid cooling solutions as its own during the 2022 SuperComputing Conference in Dallas. In doing so, the Report cites to "patent and utility model records" which evidence Ablecom has recent water cooling patents, and to "[a] former employee of Ablecom [who] also stated that Super Micro was showcasing Ablecom's liquid cooling solutions at the 2022 SuperComputing Conference, per their LinkedIn."  "In short, the Company's related party 'contract manufacturer' to whom it outsources basic component manufacturing and assembly might also be designing its liquid-cooling solutions, which are being touted as proprietary."

71.    Regarding the Company's undisclosed related party dealings, the Report featured various companies that it has apparent involvement in, but has never disclosed to investors, including: Aeon Lighting Technology ("Aeon Lighting"), Aeon Biotech a/k/a Hongguo Biotechnology Co ("Aeon Biotech"), Abelestnet Technology Limited, Lambda Labs, and Leadtek.

72.    Pertinently, regarding Aeon Lighting and Aeon Biotech, the Report noted both companies are operated by James (Jianguo) Liang, Super Micro CEO Charles Liang's "third and youngest brother," and that he owns 85.7% of the shares of Aeon Lighting" and "99% of Aeon Biotech."  The Reported noted the following connections to Super Micro:

In addition to producing LED lighting, [Aeon Lighting] also produces computer components and … specifically list chassis manufacturing, rail sliders, cooling systems, power supplies and metal prototyping as its product offering.
Its company brochure prominently displays a Super Micro branded workstation chassis.

***

Not only is Aeon Lighting in the server business, like Super Micro, Compuware and Ablecom, it also operates from the same location.

Aeon's website also lists a job posting for a production role, located at "No. 306, Chang'an Street, Bade District, Taoyuan City" in Taiwan, the same address as Ablecom and Compuware's manufacturing facility, within the industrial campus it shares with Super Micro.

James Liang's second company Aeon Biotech … seems to have pivoted from sterilization equipment to the server business.

\*\*\*

A profile on leading Taiwanese job listing website states that Aeon Biotech is 'providing the most complete AI server design, research and development, and sales." The profile also states the company is located within the 'Supermicro AI Technology Park"

73.    The Report additionally provided the account of a former sales director of the Company and media reports who confirmed that Aeon was a supplier of Super Micro.

74.    In reference to the other undisclosed, related party dealings, the Report disclosed the following information:

Super Micro CEO Charles Liang's other brother, Bill (Jianda) Liang, who runs a disclosed related party, Compuware, named in the previous part, is a shareholder and director of another Hong Kong entity called "Ablestnet Technology Limited"

\*\*\*

Bill Liang is also the Chairman and 17% shareholder of another similarly-named entity in Taiwan called "Ablestnet Computer Inc" – which itself holds a 9.34% stake in Compuware . . .
Both the Ablestnet Taiwan and Hong Kong entities appear to be undisclosed related-party suppliers or resellers for Super Micro

\*\*\*

Despite selling almost identical products, offering OEM services and being located at the site of a related party, Compuware, neither Ablestnet's Taiwanese or Hong Kong Entites are mentioned in Super Micro's filings.
\*\*\*
Lambda seems to have purchased hardware and datacenter space through Super Micro, without disclosure of the potential related party nature of the deal owing to a Super Micro investment.
\*\*\*
Ablecom and Compuware now own 19.85% and 9.93% of Leadtek . . .

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Both of Charles Liang's brothers [Bill and Steve Liang] later took board seats at Leadtek on December 27th, 2023, per Leadtek filings.

Super Micro makes no reference to any transactions with Leadtek, despite advertising almost identical products, utilizing Super Micro parts on its website. We reached out to Leadtek's investor relations spokesperson, Michael Yang, to understand more about the relationship. He confirmed that Leadtek was using parts from Super Micro: "We will take their [Super Micro's] motherboard then take Ablecom's case then Compuware's power supply."

\*\*\*

Given the circular nature of their relationship, the indirect ownership by Charles Liang and the close ties to Super Micro, this appears to be a de facto, undisclosed related party.

75.    The Report additionally provided significant detail regarding the Company's continued shipments to wartime Russia in a purported attempt to circumvent United States export restrictions and risk sanctions and potentially the halt of a significant portion of the Company's current business. The Report concluded:

Super Micro products have been shipped to Russia in larger-than-ever volumes since the invasion of Ukraine, based on our analysis of more than 45,000 import and export transactions provided by trade aggregator Tradesparq.

\*\*\*

In calendar year 2023, exports of Super Micro products to Russia rose to $126.6 million – 9.6x higher than in 2021 – per Tradesparq data. That value was equivalent to 4.9% of Super Micro´s total worldwide sales, excluding the U.S., in calendar 2023, per filings

\*\*\*

We believe that all the common-sense indicators suggest that Super Micro continued to knowingly supply one of its longstanding Russian customers first via a California distributor operated by a key executive of one of its authorized partners and later via a web of Turkish shell companies.

Trade data shows Super Micro exporting goods directly to Niagara until February 24th, 2022, the day Russia invaded Ukraine.

Then between July 12th, 2022 and February 8th, 2023, a California entity named Business Development International took over exports of Super Micro products to Niagara – in apparent contravention of U.S. trade restrictions – per import-export data.

In just a little more than 6 months, Business Development International shipped more than $5.8 million of "computing machine devices", "data processing blocks" and "parts and accessories" solely to Niagara Computers in Russia, per Tradesparq.

***

Just as California-based Business Development International's export operations were winding down, three recently-created Turkish companies took over shipping Super Micro products to Niagara.

The largest, Koc Gemicilik Ve Tasimacilik, was incorporated on January 11, 2022 – about five weeks before Russia invaded Ukraine, per the Turkish corporate gazette

***

Between March 6, 2023 and December 21, 2023, Koc Gemicilik Ve Tasimacilik exported $32.1 million of Super Micro products solely to Niagara in Russia, per Tradesparq.

In June 2024, Koc Gemicilik Ve Tasimacilik was placed under U.S. sanctions for its role in smuggling restricted items to Russia.

The other two export intermediaries, Alfament Yazilim Teknoloji and AMD Ithalat Ihracat were both incorporated in Turkey within two months of the Russian invasion of Ukraine, per the Turkish corporate gazette.
Neither entity nor their sole shareholders appear to have any significant online presence.

Between January 2023 and October 2023, those two entities shipped a combined $8.3 million of Super Micro components to Niagara, per Tradesparq. The vast majority of those products corresponded to HS trade prefix 8471.50 – items the U.S. says are being diverted for military use.

Newly-created Turkish entities, run by Ukrainian and Russian citizens, with little or no trading history and little or no online presence would have been an unmissable warning sign during even the most rudimentary due diligence and export compliance.

***

Between November 2, 2022 and November 14, 2023, Beiliande [an "Authorized Partner" of Super Micro via its partnership program] exported Super Micro products with a declared customs value of approximately $10.25 million to Russia – via both its Shenzhen and Hong Kong operations, per Tradesparq.

The largest single Russian customer supplied by Beiliande was called Asilan, based in St Petersburg, which received goods with a declared customs value of about $3.6 million, per Tradesparq.

***

Asilian states on the website that it is a partner of Super Micro, provides a link to Super Micro in Holland and features photos with Asilan personnel carrying boxes marked with the Super Micro logo. Its website features multiple links to what it says are Super Micro servers and data storage systems.

***

Moscow-based IT distributor Vneshekostil received about $29.4 million of Super Micro products following Russia´s 2022 invasion of Ukraine, per Tradesparq. It appears to have had no prior trading relationship with Super Micro and received most of the components via a Hong Kong exporter created seven weeks after the war began.

Vneshekostil was sanctioned by the U.S. in September 2023 after it became "one of the largest importers of dual-use chips into Russia", per the U.S. Treasury.

76.     As a result of these revelations on August 27, 2024, the price of the Company common stock declined by $14.87 per share, falling 2.64% to close at $547.64.

77.     On August 28, 2024, the Company announced it would "Delay Form 10-K filing for Fiscal Year 2024." The Company provided the following explanation for the delay:

Super Micro is unable to file its Annual Report within the prescribed time period without unreasonable effort or expense. Additional time is needed for Super Micro's management to complete its assessment of the design and operating effectiveness of its internal controls over financial reporting as of June 30, 2024.

78.     The aforementioned disclosures that came to light in the Report and the apparent resulting delay in the Company filing its fiscal year 2024 reporting are in direct contrast to the Company's fiscal reporting and associated statements and disclosures. On those publications, the Company continually praised the alleged significant growth and healthy relationship with its related parties, and further firmly indicated it had ceased all dealings with Russia pursuant to the United States export restrictions, obfuscating the risk of potential sanctions on the Company's profitability.

79.     Investors and analysts reacted immediately to these revelations. The price of the Company's common stock declined dramatically. From a closing market price of $562.51 per share on August 26, 2024, the Company's stock price fell to $443.49 per share on August 28, 2024, a decline of about 21.16% in the span of only two days.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

80.    A number of well-known analysts who had been following the Company lowered their price targets in response to the Company's disclosures. For instance, CFRA, while dropping their buy rating to hold, noted that they "downgrade SCMI to Hold following Hindenburg Research's recent allegations of accounting manipulation, export control failures, and customer issues." The analyst also noted multiple sources of concern, stating that "SCMI's delayed 10-K filing and potential reputational damage raises concern," "the unrefuted allegations and risk of customer erosion warrant caution," and "[t]he company's previous encounter with similar issues in 2018 further amplifies our concerns."

81.    The fact that these analysts, and others, discussed the Company's shortfall and below expectation projections suggests the public placed significant weight on the Company's prior revenue and sales estimates. The frequent, in-depth discussion of the Company's guidance confirms that the statements during the Relevant Period were material. As a result of the wrongdoing alleged herein, the Company has suffered damage.

82.    On November 18, 2024, the Company issued a press release announcing the appointment of an independent auditor and the filing of "Compliance Plan" with Nasdaq. The press release stated in relevant part;

> Super Micro Computer, Inc. (Nasdaq: SMCI), a Total IT Solution Provider for AI, Cloud, Storage, and 5G/Edge, announced today that the Audit Committee of its Board of Directors has engaged BDO USA, P.C. ("BDO") as its independent auditor, effective immediately. BDO is a member firm of BDO International, one of the world's top five accounting firms network with over 115,000 professionals across its global network and a recognized leader in audit and assurance.
>
> "We are pleased to welcome BDO as Supermicro's independent auditor," said Charles Liang, President and CEO of Supermicro. "BDO is a highly respected accounting firm with global capabilities. This is an important next step to bring our financial statements current, an effort we are pursuing with both diligence and urgency."
>
> Additionally, the Company announced that it has submitted a compliance plan to The Nasdaq Stock Market ("Nasdaq") to support its request for an extension of time to regain compliance with the Nasdaq continued listing requirements.
>
> In its compliance plan to Nasdaq, the Company indicated that it believes that it will be able to complete its Annual Report on Form 10-K for the year ended June 30,

2024, and its Quarterly Report on 10-Q for the fiscal quarter ended September 30, 2024 and become current with its periodic reports within the discretionary period available to the Nasdaq staff to grant. Pursuant to Nasdaq rules, Supermicro's securities will remain listed pending Nasdaq's review of the compliance plan.

83.    As reported by Bloomberg:

Super Micro Computer Inc. shares jumped as much as 21% after the company hired a new auditor and filed a plan to come into compliance with Nasdaq listing requirements. The server maker said it submitted a plan to the Nasdaq Exchange for filing its 10-K financial disclosure report delayed in August. The company also announced that it appointed BDO USA as its independent auditor, effective immediately. "In its compliance plan to Nasdaq, the company indicated that it believes that it will be able to complete its annual report on Form 10-K for the year ended June 30, 2024, and its quarterly report on 10-Q for the fiscal quarter ended September 30, 2024 and become current with its periodic reports within the discretionary period available to the Nasdaq staff to grant," Super Micro said Monday in a statement. If Super Micro's plan is accepted by the exchange, its new deadline for the document will likely be pushed to February. It will be able to stay listed on the Nasdaq until a final decision about its compliance is made. The filing is the latest update in a tumultuous few months for Super Micro. The San Jose, California-based company delayed filing its annual 10-K following a damaging report from short seller Hindenburg Research, and last week said it would be late with quarterly reports. Super Micro is also facing a US Department of Justice probe, and in October, its auditor Ernst & Young LLP resigned, citing concerns over Super Micro's transparency and governance. Shares have tumbled more than 85% from a peak in March.

## **DAMAGE TO THE COMPANY**

### **Securities Class Action**

83.    On August 30, 2024, three securities class action complaints were filed in the United States District Court for the Northern District of California against the Company and the Officer Defendants. The complaints all allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, in the cases captioned: *Spatz v. Super Micro Computer, Inc.*, *et al.*, Case 5:24-cv-06193 (N.D. Cal.) (the "Spatz Action"); *Averza v. Super Micro Computer, Inc., et al.*, Case 5:24-cv-06147 (N.D. Cal.) (the "Averza Action"); and *Menditto v. Super Micro Computer, Inc., et al.*, Case 5:24-cv-01649 (N.D. Cal.) (the "Menditto Action," and together with the Averza and Spatz Actions, the "Securities Class Actions").

84.    As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's former officers. The Company will continue to incur significant sums in relation to the above Securities Class Actions and any liability or settlement that results.

**Unjust Compensation**

85.    At all relevant times, the Company paid lucrative compensation to certain of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

86.    Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *supra*, for which they were compensated for.

87.    However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because the Individual Defendants failed to carry out their respective duties, the compensation they received during the Relevant Period was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Share Repurchases**

88.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company.

89.    For example, on August 3, 2022, after the expiration of a prior share repurchase program on July 31, 2022, a duly authorized subcommittee of the Company's Board approved a new share repurchase program to repurchase shares of the Company's common stock for up to $200 million at prevailing prices in the open market. The Company noted in its 2023 10-K that

"[d]uring the fiscal year ended June 30, 2023, the Company repurchased and retired 1,553,350 shares of common stock for an aggregated ***$150.0 million***. As of June 30, 2023, $50.0 million was available for additional repurchases of common stock."

90.     Accordingly, the Individual Defendants caused the Company's overpayment for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

**Additional Damages to the Company**

91.     In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

92.     The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

93.     As a direct and proximate result of the Individual Defendants' conduct, Super Micro has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## CORPORATE GOVERNANCE

94.     At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

95.     Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

1

## **DUTIES OF THE DIRECTOR DEFENDANTS**

2     96.    As members of the Board, the Director Defendants were held to the highest

3 standards of honesty and integrity and charged with overseeing the Company's business practices

4 and policies and assuring the integrity of its financial and business records.

5     97.    The conduct of the Director Defendants complained of herein involves a knowing

6 and culpable violation of their obligations as directors and officers of the Company, the absence

7 of good faith on their part, and a reckless disregard for their duties to the Company and its investors

8 that the Director Defendants were aware posed a risk of serious injury to the Company.

9     98.    By reason of their positions as officers and/or directors of the Company, and

10 because of their ability to control the business and corporate affairs of the Company, the Director

11 Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and

12 good faith. The obligations required the Director Defendants to use their utmost abilities to control

13 and manage the Company in an honest and lawful manner. The Director Defendants were and are

14 required to act in furtherance of the best interests of the Company and its investors.

15     99.    Each director of the Company owes to the Company and its investors the fiduciary

16 duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the

17 Company and in the use and preservation of its property and assets. In addition, as officers and/or

18 directors of a publicly held company, the Director Defendants had a duty to promptly disseminate

19 accurate and truthful information with regard to the Company's operations, finances, and financial

20 condition, as well as present and future business prospects, so that the market price of the

21 Company's stock would be based on truthful and accurate information.

22     100.    To discharge their duties, the officers and directors of the Company were required

23 to exercise reasonable and prudent supervision over the management, policies, practices, and

24 controls of the affairs of the Company. By virtue of such duties, the officers and directors of the

25 Company were required to, among other things:

26     (a)    ensure that the Company complied with its legal obligations and

27 requirements, including acting only within the scope of its legal authority and

28

disseminating truthful and accurate statements to the SEC and investing public;

(b)      conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)      remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, and rules and regulations; and

(f)      ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

101.    Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

102.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company. As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them, as detailed *supra*.

## THE COMPANY'S CODE OF CONDUCT

103.     The Company's Code of Conduct states that its purpose is to encourage, *inter alia*:

- Honest and ethical conduct, including fair dealing and the ethical handling of actual or apparent conflicts of interest;

- Full, fair, accurate, timely and understandable disclosures;

- Compliance with applicable governmental laws, rules and regulations; and

- Prompt internal reporting of any violations of law or the Code.

104.     The Code of Conduct applies to "all of [the Company's] directors, officers and employees," and violations of the Code of Conduct "will result in disciplinary action, up to and including termination of employment."

105.     In a section titled "**COMPLIANCE WITH LAWS, RULES AND REGULATIONS**," the Code of Conduct states, in pertinent part:

The Company is obligated to comply with all applicable laws and regulations in all countries in which it operates.

The Company is committed to full compliance with the laws and regulations of the cities, states and countries in which it operates. You must comply with all applicable laws, rules and regulations in performing your duties for the Company. Numerous federal, state and local laws and regulations define and establish obligations with which the Company, its employees and agents must comply.

Under certain circumstances, local country law may establish requirements that differ from this Code. You are expected to comply with all local country laws in conducting the Company's business. If you violate these laws or regulations in performing your duties for the Company, you not only risk individual indictment, prosecution and penalties, and civil actions and penalties, you also subject the Company to the same risks and penalties. If you violate these laws in performing

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

your duties for the Company, you may be subject to immediate disciplinary action, including possible termination of your employment or affiliation with the Company.

106.    In a section titled "**FULL, FAIR, ACCURATE, TIMELY AND UNDERSANDABLE DISCLOSURE,**" the Code of Conduct states, in pertinent part:

> All disclosure in reports and documents that the Company files with, or submits to, the SEC, and in other public communications made by the Company must be full, fair, accurate, timely and understandable. You must take all steps available to assist the Company in these responsibilities consistent with your role within the Company.

> To ensure that the Company meets this standard, you (to the extent you are involved in the Company's disclosure process) are required to maintain familiarity with the disclosure requirements, processes and procedures applicable to the Company commensurate with your duties. In particular, you are required to provide prompt and accurate answers to all inquiries made to you in connection with the Company's preparation of its public reports and disclosure. You are prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or omit, material facts about the Company to others, including the Company's independent auditors, governmental regulators and self- regulatory organizations.

107.    In a section titled "**FAIR DEALING,**" the Code of Conduct states, in pertinent part that the "[o]ur goal is to conduct our business with integrity. You should deal honestly with the Company's customers, suppliers, competitors and employees. Under federal and state laws, the Company is prohibited from engaging in unfair methods of competition, and unfair or deceptive acts and practices."

108.    In a section titled "**PROTECTION AND PROPER USE OF COMPANY ASSETS,**" the Code of Conduct states that the Company's employees, officers and directors "should endeavor to protect the Company's assets and ensure their proper use."

### THE COMPANY 'S AUDIT COMMITTEE CHARTER

109.    Pursuant to the Company's Audit Committee Charter, the purpose of the Audit Committee is to, *inter alia*, "oversee the accounting and financial reporting processes of the Company, the integrity of the financial reports and other financial information and the audits of

the Company's financial statements" and "assist with Board oversight of the Company's compliance with legal and regulatory requirements."

110.    In a section titled "**REVIEW OF FINANCIAL REPORTING POLICIES AND PROCESSES**," the Audit Committee Charter states:

> To fulfill its responsibilities and duties, to the extent that it deems necessary or appropriate, and in addition to the items described above, the Committee shall:
>
> 1.    Review and discuss with the independent auditor any audit problems or difficulties and management's response.
>
> 2.    Review and discuss with management and the independent auditor the annual audited financial statements to be included in the Company's annual reports on Form 10-K, the quarterly financial statements to be included in the Company's quarterly reports on Form 10-Q, and the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."
>
> 3.    Review and discuss with management press releases regarding the Company's financial results, as well as financial information and earnings guidance provided to securities analysts and rating agencies.
>
> 4.    Review with management and the independent auditor any significant judgments made in management's preparation of the financial statements and the view of each as to appropriateness of such judgments.

111.    In a section titled "**RISK MANAGEMENT, RELATED PARTY TRANSACTIONS, LEGAL COMPLIANCE AND ETHICS**," the Audit Committee Charter tasks the Audit Committee with the following responsibilities:

> 1.    Review any report on significant deficiencies in the design or operation of the Company's internal control structure and procedures for financial reporting ("Internal Controls") that could adversely affect the Company's ability to record, process, summarize or report financial data, any material weaknesses in the Internal Controls identified to the auditors, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Internal Controls.
>
> 2.    Review, discuss and approve the internal audit function's (i) audit plan, (ii) all major changes to the audit plan, (iii) the scope, progress and results of executing the internal audit plan, and (iv) the annual performance of the internal audit function.

3.    Periodically review and discuss with management and independent auditors the Company's disclosure controls and procedures and internal control over financial reporting as defined in applicable SEC rules.

4.    Review, approve and oversee transactions between the Company and any "related party," as such term is defined in the rules of the Exchange and SEC rules, in accordance with the Company's related party transaction policies and procedures.

5.    Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters. Adopt, as necessary, appropriate remedial measures or actions with respect to such complaints or concerns.

6.    Review and investigate conduct alleged to be in violation of the Company's Code of Business Conduct and Ethics, and adopt as necessary or appropriate, remedial, disciplinary or other measures with respect to such conduct.

7.    Periodically review and discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control the exposures, including the Company's risk assessment and risk management guidelines and policies.

8.    Prepare the audit committee report required by the rules of the SEC to be included in the Company's annual proxy statement.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

112.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Director Defendants.

113.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

114.    Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

115.    During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants. Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

116.    At the time this derivative lawsuit was commenced, Super Micro's Board consisted of nine (9) directors – Defendant Liang, S. Liu, Fairfax, Tally Liu, Tuan, Lin, Blair, and Liaw (the "Director Defendants"), along with Susie Giordano, who joined the Board in August 2024 and is not a party to this action. Accordingly, Plaintiff must show that a majority of the Board, *i.e.*, five (5) of the Directors, cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute it.

117.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

118.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

119.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

120.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

121.    Despite the Individual Defendants having knowledge of the history of their own misconduct and mismanagement, the Director Defendants have failed and refused to seek recovery for Super Micro for any of the misconduct alleged herein.

**THE DIRECTORS ARE NOT**
**<u>INDEPENDENT OR DISINTERESTED</u>**

**<u>Defendant Liang</u>**

122.    Defendant Liang is neither disinterested nor independent, and therefore, is incapable of considering demand because he (as its Co-CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent. As such, Defendant Liang cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

123.    As CEO, Defendant Liang also fails the NASDAQ's bright-line independence test and cannot, therefore, be considered independent. As such, Defendant Liang could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Liang is therefore futile.

124.    As a trusted Company director, Defendant Liang conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

125.    As the Company's founder, highest officer, and influential member of the Board, Defendant Liang was ultimately responsible for the issuance of all of the false and misleading statements during the Relevant Period.

126.    Because of Defendant Liang's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Liang is unable to comply with his fiduciary duties and prosecute this action. Defendant Liang is in a position of

irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Actions, brought under the Securities Exchange Act of 1934.

127. Moreover, Defendant Liang signed and therefore personally made the false and misleading statements contained in the Company's SEC filings and faces a substantial likelihood of liability therefor.

128. In addition, Defendant Liang caused the Company to enter into related party transactions with entities controlled by his siblings. Thus, Defendant Liang is clearly not independent nor disinterested.

129. Moreover, Defendant Liang is not independent from Defendant S. Liu as they are spouses and would not institute a lawsuit against his wife.

130. Defendant Liang is neither independent nor disinterested. Any demand upon Defendant Liang is futile and, thus, excused.

**Defendants S. Liu**

131. Defendant S. Liu is neither disinterested nor independent, and therefore, is incapable of considering demand because she (as Senior Vice President) is an employee of the Company who derives substantially all of her income from her employment with the Company, making her not independent. As such, Defendant S. Liu cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability and threaten her livelihood.

132. Further, as Co-Founder of the Company, Defendant S. Liu is irreconcilably conflicted and cannot be considered independent and capable of instituting or prosecuting this action.

133. As a trusted Company director, Defendant S. Liu conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

134.     As the Company's co-founder, current officer, and influential member of the Board, Defendant S. Liu was ultimately responsible for the issuance of all of the false and misleading statements during the Relevant Period.

135.     Moreover, Defendant S. Liu signed and therefore personally made the false and misleading statements contained in the Company's SEC filings and faces a substantial likelihood of liability therefor.

136.     In addition, Defendant S. Liu has three family members that are employed by the Company in San Jose, California. As such, Defendant S. Liu cannot be considered independent or disinterested. Moreover, Defendant S. Liu is not independent from Defendant Liang as they are spouses and would not institute a lawsuit against her husband.

137.     Defendant S. Liu is neither independent nor disinterested. Any demand upon Defendant S. Liu is futile and, thus, excused.

**Defendant Liaw**

138.     Defendant Liaw is the Company's Co-Founder and previously held various executive roles within the Company. As such, Defendant Liaw is irreconcilably conflicted and cannot be considered independent and capable of instituting or prosecuting this action.

139.     As a trusted Company director, Defendant Liaw conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

140.     As the Company's co-founder, former officer, and influential member of the Board, Defendant Liaw was ultimately responsible for the issuance of all of the false and misleading statements during the Relevant Period.

141.     Moreover, Defendant Liaw signed and therefore personally made the false and misleading statements contained in the Company's SEC filings and faces a substantial likelihood of liability therefor.

142.    Defendant Liaw is neither independent nor disinterested. Any demand upon Defendant Liaw is futile and, thus, excused.

**Defendants Fairfax, T. Liu, Lin, and Blair**

143.    Defendants Fairfax, T. Liu, Lin, and Blair (the "Audit Defendants") each serve as members of the Company's Audit Committee. As such, they were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting.

144.    At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

**Additional Reasons Demand is Futile**

145.    Each of the Director Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay for its own common stock during the Relevant Period. The Director Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

146.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and

1  regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest,

2  conduct business in an honest and ethical manner, and properly report violations of the Code of

3  Conduct. Thus, the Director Defendants face a substantial likelihood of liability and demand is

4  futile as to them.

5      147.  Super Micro has been and will continue to be exposed to significant losses due to

6  the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits

7  against themselves or any others who were responsible for that wrongful conduct to attempt to

8  recover for Super Micro any part of the damages Super Micro suffered and will continue to suffer

9  thereby. Thus, any demand upon the Director-Defendants would be futile.

10      148.  The Director Defendants' conduct described herein and summarized above could

11  not have been the product of legitimate business judgment as it was based on bad faith and

12  intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim

13  exculpation from their violations of duty pursuant to the Company's charter (to the extent such a

14  provision exists). As a majority of the Director Defendants face a substantial likelihood of liability,

15  they are self-interested in the transactions challenged herein and cannot be presumed to be capable

16  of exercising independent and disinterested judgment about whether to pursue this action on behalf

17  of the shareholders of the Company. Accordingly, demand is excused as being futile.

18      149.  The acts complained of herein constitute violations of fiduciary duties owed by

19  Super Micro's officers and directors, and these acts are incapable of ratification.

20      150.  The Director Defendants may also be protected against personal liability for their

21  acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers'

22  liability insurance if they caused the Company to purchase it for their protection with corporate

23  funds, *i.e.*, monies belonging to the stockholders of Super Micro. If there is a directors' and

24  officers' liability insurance policy covering the Director-Defendants, it may contain provisions

25  that eliminate coverage for any action brought directly by the Company against the Director

26  Defendants, known as, inter alia, the "insured-versus-insured exclusion."  As a result, if the

27  Director Defendants were to sue themselves or certain of the officers of Super Micro, there would

28

be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

151.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Super Micro to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

152.    Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least five of the Director Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

#### (Against The Individual Defendants for Breach of Fiduciary Duties)

153.    Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

154.    The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

155.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

156.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

157. The Individual Defendants also breached their fiduciary duties of loyalty and good faith by making false and/or misleading statements and/or filing to disclose that the Company's optimistic reports of significant growth, earnings potential, a healthy relationship with its related parties, and an assertion of ceasing shipment to wartime zones in compliance with government restrictions fell short of reality as they failed to: (i) incorporate the true circumstances of the Company's accounting and improper revenue recognition; (ii) disclose that they caused the Company to enter into related party transactions with entities controlled by Defendant Liang's siblings; and (iii) disclose the true state of the Company's business dealings in and to Russia in violation of U.S. export control laws.

158. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

159. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

**SECOND CAUSE OF ACTION**

**(Against the Individual Defendants for Waste of Corporate Assets)**

160. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

161. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

162. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and

(iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

163.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

### THIRD CAUSE OF ACTION

### (Against The Individual Defendants for Unjust Enrichment)

164.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

165.    By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, the Company, as detailed *supra*.

166.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

167.    Plaintiff, as a shareholder and representative of the Company seeks restitution from Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

### FOURTH CAUSE OF ACTION

### (Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder)

168.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

169.    During the Relevant Period, the Individual Defendants disseminated and/or approved public statements that failed to disclose that the above-referenced truthful facts and as a result of the foregoing, the Individual Defendants' public statements were materially false and misleading at all relevant times. Thus, the price of the Company's shares was artificially inflated due to the deception of the Individual Defendants. Despite this artificial inflation in the price of the Company's shares, the Individual Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing significant financial harm to the Company.

170.    As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Super Micro, their control over, and/or receipt and/or modification of Super Micro's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Super Micro, participated in the fraudulent scheme alleged herein.

171.    The Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Relevant Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

172.    The Individual Defendants were each members of Super Micro's Board of Directors and senior management team during the aforesaid time period. Based on their roles at Super Micro, each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

173.     At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems at Super Micro, the Individual Defendants knew and/or recklessly disregarded the extent and scope of their statements during the Relevant Period.

174.     Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein. The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

175.     As such the Individual Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; and (ii)  made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

176.     As a result of the wrongful conduct as alleged herein, the Individual Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and are thus liable for any harm caused to the Company.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.     Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.     Awarding, against all the Individual Defendants and in favor of the Company, the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  damages sustained by the Company as a result of the Individual Defendants' breaches of their

2  fiduciary duties and other unlawful conduct;

3      C.      Directing the Company to take all necessary actions to reform and improve its

4  corporate governance and internal procedures, to comply with the Company's existing governance

5  obligations and all applicable laws and to protect the Company and its investors from a recurrence

6  of the damaging events described herein;

7      D.      Awarding to Plaintiff the costs and disbursements of the action, including

8  reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

9      E.      Granting such other and further relief as the Court deems just and proper.

10 Dated: December 5, 2024                    Respectfully submitted,

11                                 **WOLF HALDENSTEIN ADLER**
                                   **FREEMAN & HERZ LLP**
12

13                                 By: */s/ Alex J. Tramontano*
14                                     ALEX J. TRAMONTANO

15                                 BETSY C. MANIFOLD
                                   RACHELE R. BYRD
16                                 ALEX J. TRAMONTANO
                                   750 B Street, Suite 1820
17                                 San Diego, CA 92101
                                   Telephone: (619) 239-4599
18                                 Facsimile: (619) 234-4599
                                   manifold@whafh.com
19                                 byrd@whafh.com
                                   tramontano@whafh.com
20

21                                 **WOLF HALDENSTEIN ADLER**
                                   **FREEMAN & HERZ LLP**
22                                 BENJAMIN Y. KAUFMAN
                                   270 Madison Ave., 9th Floor
23                                 New York, NY 10016
                                   Telephone: (212) 545-4650
24                                 Facsimile: (212) 686-0114
                                   kaufman@whafh.com
25
                                   **ISQUITH LAW PLLC**
26                                 FRED T. ISQUITH
                                   103 E. 84th Street
27                                 New York, NY 10028
                                   Telephone: (718) 775-6478
28

---

- 53 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

isquithlaw@gmail.com

*Attorneys for Plaintiff Dr. Mithilesh K. Jha*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFICATION OF DR. MITHILESH K JHA

I, Dr. Mithilesh K. Jha, am a plaintiff in this action. I have reviewed the allegations made in the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  November,  2024

11/20/2024

DR. MITHILESH K. JHA